UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

MAKSIM SHERMAN,

                  Plaintiff,

-- against --

COUNTY OF NASSAU AND POLICE OFFICER
DAVID J. MCGARRIGLE,

                  Defendants.
-------------------------------------------------------------- x

16-CV-1416 (DRH) (AYS)

**PLAINTIFF'S DEPOSITION NOTICE**

Plaintiff MAKSIM SHERMAN by and through his attorneys, McMANUS ATESHOGLOU AIELLO & APOSTOLAKOS PLLC, intends to read the following deposition testimony into evidence at trial:

**DEPOSITION of non-party witness VERONICA RITTER taken August 11, 2017**

**Including Exhibits marked as Plaintiff's 1 and 2 and Defendant's A**

**Page 8, lines 16 – 23**

Q. Do you recall an incident occurring back on April 2, 2015 outside of that address?

A. I do.

Q. Do you remember about what time it was when it occurred?

A. I want to say I woke up maybe around 1:00 a.m.

**Page 9, lines 6 - 10**

Q. At approximately 1:00 in the morning you indicated you awoke, what caused you to awake?

A. I heard loud screams outside the window.

**Page 12, lines 15 – 25, Page 13, lines 1 - 3**

Q. Did you come out of your home when the cops arrived or sometime after that?

A. A few minutes after that.

Q. When the cops arrived, did you observe what was going on?

A. Yes.

Q. What did you see happening at that point?

A. My mom and I were just waiting to see what the situation would be like, if they were able to stop it. Then I think that they -- maybe my sister did something and then we ran outside.

**Page 13, lines 15 – 25, Page 14, lines 1-3**

Q. Was there any physical interaction or was it just verbal?

A. With my sister and Max?

Q. Yes.

A. Just verbal.

Q. After the first cop car got there and the two cops got out, were you able to hear any of the interaction between the cops and either your sister or Max?

A. No, but it quickly escalated and the cops had Max and then we were just – we kind of -- my mom and I kind of split and I was with Max and my mom was with my sister.

**Page 15, lines 20 – 25, Page 16, lines 1-7**

Q. The first physical intersection that you actually observed, was that between the officer and your sister, the officer and Max or something else?

A. The officer and Max.

Q. What was the initial interaction physically you saw between them?

A. He was putting Max against the hood of the car.

Q. When you say he?

A. The cop was putting Max against the hood of the car, like his head.

**Page 18, lines 6 – 25, Page 19, lines 1- 11**

Q. At any time before you saw the cop interacting physically with Max, did you see Max touch either of the two cops?

A. No.

Q. Did you overhear Max threatening either of the two cops before they became physical with him?

A. No.

Q. Do you recall seeing Max do anything that would have been threatening or that you felt would have caused the police to become physical with Max?

A. No. But I'm not a cop, so.

Q. I'm just asking what you saw, okay?

A. Yeah.

Q. If you saw him raise his hands or, you know, be aggressive with any of the officers before they became physical with Max?

A. I don't think so.

Q. The first interaction physically you saw between an officer and Max was then putting him on a car you said?

A. Yeah, like kind of very aggressively putting him against the car, so much so that I was even on the cop's back like trying to get him off and it's kind of a shock that I wasn't arrested that night because they pretty much arrested everyone.

**Page 20, lines 1 - 11**

Q. Right before that could you describe at all, and I know a lot was going on, but did Max say anything, did he have his hands up, is there anything you can remember right before that?

A. He was yelling that you're hurting her, and just trying to help my sister, yeah.

Q. Verbally or physically?

A. Verbally.

**Page 21, Lines 16 – 25, Page 22, Lines 1 - 4**

Q. Did you have a cell phone at the time?

A. My mom did and they took that. Did anybody record any of this? Yeah, they took that.

Q. Was that on your mother's cell phone?

A. Yes, it was on my mom's cell phone and she still hasn't gotten it back.

Q. Who took the phone?

A. Another cop one of the twelve or so cops that arrived at the scene shortly after.

**Page 22, line 25, Page 26, Lines 1 - 7**

Q. Was your sister intoxicated at the time?

A. Yes.

Q. Do you know if Max was intoxicated at the time?

A. I don't believe so.

**Page 23, Lines 23 – 25, Page 24, Lines 1 – 2**

Q. ... Did you ever see Max interact physically with the officer that was dealing with your sister?

A. No.

**Page 24, lines 11 - 17**

Q. I'm going to show you a statement that you, I believe, had given in connection with the underlying criminal case against Maksim Sherman and ask you to just read it over and then I'll just ask you a few questions.

A. Okay.

**Page 25, lines 17 – 25, Page 26, lines 1 – 25, Page 27, lines 1 – 25, Page 28, lines 1 - 12**

Q. This statement was given on April 12, 2015, correct?

A. Yep.

Q. So, about ten days after this occurred?

A. Yes.

Q. Again, I just want to direct you to the point where it says, it's about the middle, "the next thing that happened was Max got hit over the head with a baton by the other police officer who came from behind Max and hit him at least one time and possibly another time. While Max was being hit over the head, I was standing right behind the police officer who was hitting Max in the head. I was telling the cop to stop hitting Max."

A. Reading over those few sentences, does that refresh your recollection as to what occurred that evening?

Q. No, I can't say that for sure now, I don't remember that particular instance but I believe this is true.

Q. Would there be any reason for this not to be an accurate recording of the statement that you gave?

A. No.

Q. So, do you believe what's contained in this statement to be accurate as to what occurred that evening?

A. Yes.

Q. You just don't remember right now?

A. Yeah.

Q. I'm just going to ask you to take a look at the very last sentence on the second page.

MR. AIELLO: And just for the record, it's a two-page document that we had marked today as **Plaintiff's Exhibit 2** that we're looking at.

Q. Where it says, "This statement is true to the best of my knowledge and belief. I would like to repeat the following, Max Sherman never hit the police officers, never pushed the police officers and did not flail his arms and did not resist arrest." Reading that final paragraph, does that refresh your recollection as to Max Sherman's actions that evening?

A. Yes, they still are clear in my head.

Q. So, you do actually recall that Max never hit the officers, never pushed them and did not flail his arms or resist arrest?

A. Correct.

Q. Having been a witness to this incident, do you recall any reason why the officers would have used the force they did against Max? In other words, was there anything you think that would have instigated them to strike him or to treat him in the manner in which they did?

A. I believe they probably thought he was protecting my sister but nothing that -- he didn't act in a way that required defense.

**Page 31, lines 2 – 8**

Q. Is there anything you would like to add about what you witnessed that evening, for the record?

A. It was all my sister's fault. Hundred percent. Max is an innocent bystander.

**EXAMINATION BY MR. REISSMAN:**

**Page 52, lines 10 – 5, Page 53, lines 1 - 24**

Q. Did you see the officer strike Max at any time? You have to say what you saw.

A. Well --

Q. Don't infer, if I said tell me what you're seeing right now. Did you actually see any officer –

A. This is so long ago.

Q. I know. But did you ever actually see any officer strike Max?

A. Yes.

Q. When did you see that?

A. I think earlier when early like earlier in the events of the night because Max was bleeding.

Q. But you didn't see how he became to be bleeding?

A. Well, he was hit with the baton.

Q. Did you see him being hit with the baton?

A. I believe so.

Q. Did you ever see any officer strike Max with a baton?

A. I'm having difficulty answering because of memory.

Q. Well, just answer to the best of your memory. As it plays in your mind, did you actually see an officer take his baton and pop Max on the head?

A. I think so.

Q. But you're not sure?

A. No.

**Page 60, lines 10 – 25, Page 61, lines 1 - 3**

Q. You say you' re not sure, you think you saw one of the officers strike Max with a baton?

A. Yes.

Q. Do you know what color the baton was?

A. Black.

Q. Is that a question or?

A. I don't know for sure but I believe it was black. I mean, it was also late at night, so I can't answer with certainty.

Q. To the best of your recollection, if you recall the officer striking Max in the head, how many times did you see him strike Max in the head?

A. That I don't know. Once or twice?

**Page 61, lines 13 – 23**

Q. If you look at **Plaintiff's Exhibit 2**, the last paragraph, I'll read it into the record again. "This statement is true to the best of my knowledge and belief, I would like to repeat the following: Max Sherman never hit the police officers, never pushed the police officers and did not flail his arms and did not resist arrest." Are those your words?

A. Yes, and they are a hundred percent true.

**Page 62, lines 6 – 13**

Q. Did you hear Max scream at the officers?

A. I heard him say you're hurting her, you're hurting her, stop hurting her, yeah.

Q. Did you see Max go to the officer that was dealing with Tatiana?

A. No.

**FURTHER EXAMINATION BY MR. AIELLO:**

**Page 63, lines 9 – 21**

Q. At any point did you see Maksim Sherman jumping on the officer's back that was dealing with your sister?

A. No.

Q. When you indicated that you came up behind the officer that had Maksim Sherman facedown on the car, was Maksim doing anything at that point, was he resisting, was he flailing?

A. He was yelling.

Q. Other than yelling, was he anything with his body?

A. No, he was totally restrained.

**FURTHER EXAMINATION BY MR. REISSMAN:**

**Page 64, lines 15 - 19**

Q. I'd like to show you what's been marked as **Defendant's Exhibit A** which is an arrest report, you don't have to read the whole thing, just take a look. It's two pages.

**Page 66, lines 13 – 25, Page 67, lines 1 - 14**

Q. Now, the next sentence, I'm going to read that to you. "At this point Subject Sherman ran around the vehicle and pushed Officer Acquilino in an attempt to impede the handcuffing of Subject Ritter."

A. Did you see Mr. Sherman run around the vehicle and push Officer Acquilino?

A. I did not.

Q. Next sentence, I'll start that sentence again. "To impede the handcuffing of Subject Ritter, Officer McGarrigle was able to separate Subject Sherman from Officer Acquilino but Subject Sherman became more combative jumping on Officer McGarrigle's back screaming get off her." Did you see that?

A. No, if anyone was on his back it was me.

Q. Next sentence, "Officer McGarrigle informed Subject Sherman he was under arrest and he began to continue screaming and flailing his arms refusing to be handcuffed."

Did you see Mr. Sherman do that?

A. I did not.

**Page 68, lines 12 – 23**

Q. Now, just a couple minutes ago you were reading this and frowning and said that's such a lie, what were you referring to?
A. When they said that the phone was secured voluntarily at the scene, that is an outright outrageous lie. They were --physically ripped it out of her hand.

Q. Out of your mother's hand?

A.  Yes. That's completely legal to record any activity, which was never returned to her to this day.

Dated: New York, New York
       January 20, 2020

Yours, etc.

*[signature]*

By: Philip V. Aiello (PA – 2908)
McMANUS ATESHOGLOU
AIELLO & APOSTOLAKOS PLLC
Attorneys for Plaintiff
MAKSIM SHERMAN
48 Wall Street, 25th Floor
New York, New York 10005
(212) 425-3100
File No.: OTH8330
