UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MAKSIM SHERMAN,

                  Plaintiff,

      -against-

COUNTY OF NASSAU, and POLICE
OFFICER DAVID J. McGARRIGLE,

                  Defendants.
-------------------------------------------------------X

**MEMORANDUM & ORDER**

16-CV-1416 (DRH)(AYS)

**APPEARANCES:**

**For Plaintiff:**
McManus Ateshoglou Aiello & Apostololakus PLLC
44 Wall Street, 25th Floor
New York, New York 10005
By:    Philip V. Aiello, Esq.


**For Defendants:**
Jared A. Kasschau
Nassau County Attorney
H. Lee Dennison Building
One West Street
Mineola, New York 11501
By:    Spencer D. Shariro, Esq.


**HURLEY, Senior District Judge:**

      At the conclusion of the trial of this matter, the jury returned a verdict in

favor of the plaintiff Maksim Sherman ("Plaintiff" or "Sherman") and against

defendant Police Officer David J. McGarrigle ("Defendant" or "McGarrigle") on each

of the claims presented, viz. federal civil rights claim for excessive force and state

law claims for assault and battery.  They awarded Sherman $100,000.00 in

compensatory damages together with $1,000,000.00 via a punitive damages assessment. Presently before the Court is Defendant's post-trial motion seeking judgment as a matter of law or a new trial, pursuant to Federal Rules of Civil Procedure 50(b) and 59.  For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

This case arises out of an incident on April 1, 2015 in East Meadow, New York.

## I.     The Trial Testimony

 Four witnesses testified at the trial; their testimony is summarized below.

### A.     Veronica Ritter's Testimony

Veronica Ritter ("Veronica") was living with her parents and sister, Tatiana, on April 1, 2015. That night she awoke to the sounds of Tatiana "screaming" outside her window. She looked out and saw Tatiana and Sherman. Veronica learned that her mother had already called the police. Looking out the living room window, both Veronica and her mother saw two police officers arrive. The two then exited the house with Veronica going towards Sherman and her mother going towards Tatiana. (Tr. at 35-38, 45-46.)

During the entire time she was outside, Veronica had Sherman in her sights yet never saw him strike, push, or jump on either officer; nor did she see him flail his arms or obstruct the actions of the police officers. She saw McGarrigle hit Plaintiff at least once with a baton and throw him on the car to handcuff him. She

never saw Plaintiff hit his head on the curb. After Plaintiff was hit on the head, Veronica jumped onto McGarrigle's back. During this time, her mother was recording the incident on her phone but when back-up officers arrived, they ripped the phone out of her hand. The phone has not been returned. (*Id.* at 38-43, 48-49.)

### B.    Plaintiff's Testimony

On the evening in question, Plaintiff went to a bar in New York to meet his then girlfriend Tatiana Ritter ("Tatiana"); she was intoxicated when he arrived. Plaintiff had one drink before the two of them left the bar about 11:00 – 11:30 pm so Plaintiff could drop Tatiana off at her home in East Meadow. They had "a mild argument in the car about her behavior." (Tr. at 52-56.)

Upon arriving at Tatiana's house, Plaintiff parked in front. Tatiana "got out of the car and she was ready to leave. Next thing you know she got really upset and jumped back into the car and started screaming."  (Tr. at 56.) In an attempt to diffuse the situation, Sherman exited the car, but Tatiana followed him, screaming. (*Id.*)

McGarrigle was the first police officer to arrive at the scene. With both McGarrigle and Sherman standing on the driver's side of the car, McGarrigle asked Sherman for identification and Sherman complied. Neither Sherman nor McGarrigle raised their voices. McGarrigle told Sherman he could leave. (*Id.* at 57.)

While Plaintiff and Defendant were speaking, Police Officer Acquilino ("Acquilino")  arrived and attempted to calm Tatiana down, to no avail; Tatiana became increasingly agitated.  Acquilino placed his left hand on Tatiana, indicating

for her to "calm down," but Tatiana continued to yell loudly. Sherman observed Acquilino's "right hand . . . almost going back as if he was going to hit her." Sherman "had no idea he was going to arrest her. To [him] it looked like he was going to punch her." (*Id.* at 58-62.)

In order to shield her, Sherman turned towards Tatiana with his hands up and out to demonstrate he had nothing in them. Sherman never made physical contact with either officer; as soon as he turned, he was struck on the top of the head twice. He then dropped himself on the hood of the car; as result the hood was covered in blood from a gushing wound. McGarrigle then knocked Sherman's knees to drop him; Sherman fell on to his buttocks and McGarrigle handcuffed him. McGarrigle laughed when Sherman asked why he struck him. Sherman went via ambulance to a hospital where he had x-rays and a CAT scan of his head and was given a tetanus shot. He was diagnosed with a laceration to the head, which required ten staples to close, and a concussion. While at the hospital, one of the officers asked Sherman if he was a teacher and when Sherman said yes, commented that he could kiss his career goodbye. (*Id.* at 62-69.)

Sherman was then brought to the precinct. While there he requested Advil for the pain, which request was refused. He spent the night in jail. (*Id.* at 69-70.)

In addition to a Bachelor of Science, Sherman has two Master's degrees. On April 1, 2015 he was employed as a teacher and as the Dean of Bay Academy Middle School, a highly competitive magnet school. Under New York City Board of Education rules, "if you have a felony, you can't be around kids." Thus, on his return

to work, he was removed from both of his prior positions, forbidden to have contact with students, and directed to report to the reassignment center, also known as the "rubber room." From there he became a substitute teacher, which entailed getting a phone call each morning as to which school he should report to, and as a result bounced around at different schools. Realizing that he would never get his career back, he enrolled in a real estate course and obtained his real estate license. (*Id.* at 50-51, 72-77.)

In addition to physical injuries, Sherman struggled with depression after the incident. He sought medical attention and was prescribed Adderall which helped him focus and get his motivation back. (*Id.* at 77-78.)

With the consent of McGarrigle, the criminal charges against Sherman were ultimately dropped from felony assault on a police officer to a simple disorderly conduct. Sherman paid $10,000 to his criminal defense lawyer. (*Id.* at 75, 80.)

### C.    Acquilino's Testimony

Acquilino and McGarrigle were both on solo patrol but arrived at the scene at about the same time. Acquilino interviewed Tatiana while she stood on the side of the car near the curb and attempted to calm her down. Sherman was "[f]or the most part . . . staying out of it." As he placed Tatiana under arrest because she refused to be quiet, he felt contact from his back causing him to sway but did not see what caused the contact. He never observed Sherman resisting arrest, behave combatively or jump on McGarrigle. By the time he handcuffed Tatiana, McGarrigle had already handcuffed Sherman and had him sitting down in front of the police

car. He did not recall when he first observed Sherman was bleeding. Those portions of the police report that involved Sherman were written by McGarrigle and based on McGarrigle's observations alone. (Tr. at 90-99, 108-118.)

### D. McGarrigle's Testimony

When McGarrigle arrived at the scene, Tatiana appeared intoxicated and was in the middle of the street screaming, and having a verbal argument with Sherman. He approached Sherman who told him he was having an argument with his girlfriend. Sherman was compliant and calm. After speaking with Sherman, McGarrigle encouraged him to leave the scene. (Tr. at 122-23, 131-33.)

McGarrigle then went to speak with Acquilino and Tatiana who were standing at the rear of Sherman's vehicle on the passenger side. Acquilino was facing the front of the vehicle, speaking with Tatiana. McGarrigle stood at the rear of the vehicle on the driver's side behind Acquilino. Sherman proceeded to exit the vehicle and ran around the front of the vehicle and tried to get Acquilino's hands off of Tatiana, coming over the top of him from behind. At that point McGarrigle pushed Sherman back and put himself between Sherman and Acquilino. He told Sherman he was under arrest and tried to handcuff him. Because he was resisting being handcuffed, McGarrigle used an arm takedown, a technique where you take someone's arm, twist it and spin them in a circle to gain momentum and drive them to the ground. He did not strike Sherman with a baton; he does not carry it and it was inside his bag in his police car at the time of the incident. While he saw blood

on Sherman, he does not know how he came to be bleeding. An ambulance was called for Sherman. (*Id.* at 124-28, 134-41.)

## II.  The Jury's Verdict

Having heard two days of testimony, the jury returned a verdict in favor of Plaintiff for the sums earlier mentioned. Specifically, the jury found in favor of Plaintiff on his federal § 1983 claim for excessive force and his state law claims for assault and battery. There was no request by Defendant for the submission of special interrogatories in connection with the verdict.

## DISCUSSION

## I.  Legal Standard

### A.  Rule 50

Rule 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.' "  *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012) (quoting Fed. R. Civ. P. 50(a)(1)); *accord Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012).  The "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks omitted); *accord Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). "Under such circumstances, the district court may set aside the verdict only where

there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." *Id.* (citations, alterations, and internal quotation marks omitted); *accord Stampf v. Long Island R. Co.*, 761 F.3d 192, 197-98 (2d Cir. 2014); *see also, e.g., Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been compelled to accept the view of the moving party" (internal quotation marks omitted)).

In deciding a motion under Rule 50, the Court must disregard any evidence that weighs against the jury's verdict unless the jury was required to believe it. *Zellner*, 494 F.3d at 370 ("Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.') The question is whether, if credibility assessments are made against the moving party and all reasonable inferences are drawn against the moving party, a reasonable jury nevertheless would have no choice but to find in the movant's favor. *Zellner*, 494 F.3d at 370-71 (citing *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). In other words the court may only grant a Rule 50 motion in this posture if there is " 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise or conjecture, or . . . [there is] such

an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against him.' " *Cross,* 417 F.3d at 247 (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)). "Judgment as a matter of law on an issue as to which the movant bears the burden of proof is rare." *Broadnax v. City of New Haven*, 415 F.3d 265, 270 (2d Cir. 2005) (internal quotation omitted).

### B.    Rule 59

Federal Rule of Civil Procedure 59 provides that a Court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The standard for granting a new trial under Rule 59(a) is less stringent than the standard for judgment as a matter of law under Rule 50. *See, e.g., Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). Granting a new trial is appropriate where "the jury has reached a seriously erroneous result, or its verdict is a miscarriage of justice." *Nimely v. City of N.Y.*, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks and citations omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). But when "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a

miscarriage of justice." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (internal quotations omitted); *see also  Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-19 (2d Cir. 2012) (noting that a district court judge "must exercise their ability to weigh credibility with caution and great restraint," and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury" (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134, and *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998)).

## II.      Defendant's Motion

In support of his Rule 50 motion, defendant argues that "under the circumstances he faced in trying to take Sherman into custody, after he interfered with the arrest of Tatiana Ritter and with him fighting and struggling, the [defendant's] use of force was reasonable, and was the least amount of physical force required to seize Sherman." (Def.'s Mem in Supp. at 6.) Further, even if the force used was excessive, he is entitled to qualified immunity. (*Id.* at 7-9.) With respect to his Rule 59 motion, he asserts that the verdict is against the weight of the evidence and that the Court should reduce all damage awards under remittitur.

The Court will address each of these arguments in turn.

## III.      The Evidence Permitted the Jury to Find that Defendant Used Excessive Force

Given the totality of the circumstances, *see Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013), a reasonable jury could conclude that Defendant used excessive force against Sherman.  There was ample evidence at trial that Sherman

remained calm throughout his interactions with McGarrigle. Indeed, McGarrigle admittedly suggested that Sherman should leave. McGarrigle was not alarmed by Sherman approaching Acquilino and Tatiana and he did not alert his partner to any potential threat from Sherman. Moreover, McGarrigle's testimony regarding the incident was contradictory. At one point he stated Sherman walked calmly toward Acquilino and in another that Sherman ran towards Acquilino. The jury was not required to accept the version of the events favorable to Defendant's position. Moreover, the jury could have reasonably determined that even if Sherman was attempting to interfer with Tatiana's arrest, McGarrigle's striking Sherman twice on his head with a baton was more force than reasonably necessary under the circumstances. In sum, there was more than adequate testimony to support the jury's conclusion that McGarrigle used excessive force by striking Sherman twice in the head with his baton.

Nor is McGarrigle entitled to qualified immunity.

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's actions did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citations omitted). *Accord Mullenix v. Luna*, - - U.S. - -, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) ("The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." (internal quotation marks omitted)). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Garcia*, 779 F.3d at 92 (internal quotation marks and citation omitted).

Preliminarily, the Court notes that there was no request by the defense for special interrogatories to be put to the jury in order to elucidate the jury's verdict. For example, there was no request as to whether McGarrigle believed Sherman was going to interfere with Tatiana's arrest or acting in a menacing manner; there was no request as to whether it appeared to McGarrigle that Sherman was going to attack Acquilino. Absent that information, among others, the Court must construe the evidence in favor of Plaintiff and such a construction does not permit the conclusion that McGarrigle is entitled to qualified immunity. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) ("To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question.   If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding."); *Ellis v. LaVecchia,* 567 F. Supp. 2d 601, 609 (S.D.N.Y. 2008) (holding that because defendant "failed to request special interrogatories going to the factual issues relating to [p]laintiffs' malicious prosecution claim, the record is insufficient to permit the Court to make a finding in Defendant's favor on the

qualified immunity issue as a matter of law under Rule 50"). Viewed in the light most favorable to Sherman, he was not committing any crime, was not resisting arrest at the time he was struck, and was not menacing or engaging in threatening activity. The unprovoked striking of a private citizen violates clearly established law. *See, e.g., O'Hara v. City of New York*, 570 F. App'x 21, 23-24 (2d Cir. 2014) (No reasonable police officer could have thought that he was authorized to repeatedly punch arrestee, an unarmed, non-menacing 17-year-old, in effecting his arrest, precluding relief on officer's post-verdict motion for qualified immunity.)[1]

To the extent the current motion is premised on the assertion that Defendant is entitled to qualified immunity on the claim for excessive force it is denied.

## IV.   Weight of the Evidence

According to Defendant "each and every one of the jury's findings of liability . . . is against the clear weight of evidence: (1) the force used against plaintiff was reasonable and justified under the circumstances confronting McGarrigle" and (2) he did not act "so reprehensibly that punitive damages are warranted." In support thereof Defendant relies upon the same version of acts it urges on the Rule 50 motion. For the reasons set forth in section III *supra*, there was ample evidence to support the jury's determination that McGarrigle used excessive force.  The verdict was not against the weight of the evidence.

---

[1] It is also noteworthy that Defendant did not make a motion for a directed verdict on the issue of qualified immunity at any time before the case was submitted to the jury and does not argue here manifest injustice so as to require its consideration despite the lack of a motion. *See Fox v. Triborough Bridge and Tunnel Auth.*, 2020 WL 2616032, * 3 (E.D.N.Y. May 22, 2020).

**V.    The Request for Remittitur**

Defendant also seek a new trial on damages, or in the alternative remittitur. Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir.1990). Although he nominally challenges the total award, i.e., $1,100,000.000 in compensatory and punitive damages, his argument focuses on the amount of punitive damages awarded. Nonetheless, the Court will address both components of the award.

**A.    The Compensatory Damages Award is Not Excessive**

Turning first to the compensatory damages award, given Plaintiff's testimony about the pain he suffered and the lasting effects of being struck on the head twice by a baton, the award of $100,000 is not excessive. Similar verdicts have been upheld in cases where a defendant struck a plaintiff in the head causing physical injuries plus emotional distress. *See, e.g., Di Sorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) (remitting award of $400,000 in compensatory damages to $250,000 where plaintiff suffered bruises on her head, right forehead, lower part of her mandible, area behind her left ear, right shoulder, hands, left elbow, and spine, two large hematomas on her head, and psychological injuries as result of police officer's use of excessive force and battery); *Dancy v. McGinley*, 843 F.3d 93 (2d Cir. 2016) (Upholding $81,500 excessive force award against officer in § 1983 action, as remitted by district court, to  a 17 year-old high school student, who suffered

bruising and abrasions to his head, face, and torso as result of an inexcusable beating by police officers, where student's testimony about his substantial emotional injuries was sufficiently corroborated, and awards were within permissible range of compensatory awards approved in other excessive force cases.); *O'Neill v. Krzeminski*, 839 F.2d 924 (2d Cir. 1988) (award of $80,000 in compensatory damages for excessive force claim where plaintiff was struck repeatedly about the head by officers while handcuffed was not excessive); *Nash v. Sue Har Equities, LLC,* 45 A.D. 3d 545, 846 N.Y.S.2d 215 (2d Dep't 2007) (compensatory damages in the amount of $100,000 appropriate for assault and battery where plaintiff  suffered pain to his head and a laceration requiring several stitches).

Given the foregoing cases, together with the testimony that Plaintiff was struck twice, requiring ten staples and resulting in a concussion, and suffered from depression after the incident, the compensatory damages award is not excessive.

### B.    Remittitur is Granted with Respect to Punitive Damages

"Awards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct. Nor is there any formula to determine the dollar amount needed to effectuate deterrence. Even if there is no such thing as a correct amount of punitive damages, a legal system has an obligation to ensure that such awards for

intangibles be fair, reasonable, predictable, and proportionate." *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013) (internal citations omitted.)

In fulfilling their obligation to ensure that punitive damages award are "fair, reasonable, predictable, and proportionate," courts are to use the following guideposts set by the Supreme Court in *BMW of N. America v. Gore*, 517 U.S. 559 (1996): "(1) degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question." *Payne*, 711 at 101 (citing *Gore*, 517 U.S. at 574-75); *accord Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014). It is to an examination of these factors that the court now turns.

The first *Gore* factor, the reprehensibility of the defendants' conduct, is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. In assessing the reprehensibility of conduct, three "aggravating factors" have been identified. They include: "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee v. Edwards*, 101 F.3d 805, 806 (2d Cir. 1996) (citing *Gore*, 517 U.S. at 576).

Here, the although the conduct was violent, there was no evidence presented that Defendant engaged in repeated instances of the relevant wrongdoing. Moreover, although there is scant evidence that McGarrigle's actions in striking

Sherman were motivated by malice, his reported action afterward in intentionally stepping-on and cracking suggests otherwise. It is another aggravating factor that McGarrigle's conduct is criminalized in New York as a class "A" misdemeanor. *See Payne*, 711 F.3d at 101 (citing N.Y. Penal Law § 120.00). Mitigating factors include that by his own admission Sherman went to step between Tatiana and Acquilino, that McGarrigle and Acquilino called an ambulance ensuring Plaintiff received medical treatment, and that he only struck Sherman twice, as opposed to repeatedly. In short, although McGarrigle's conduct was reprehensible and justified an award of punitive damages, the "degree of reprehensibility" demonstrates that a $1,000,000.00 award is excessive. *Cf. id.*

Moreover, the Court has grave concerns that in setting the punitive damages award, the jury considered plaintiff's testimony concerns the effect of the April 1 "incident" on his career as an educator. With respect to that issue, the jury was instructed that as there is no cause of action for false arrest, they could not award Sherman damages for injuries proximately caused by his arrest. Further, "as to the damages plaintiff claims related to his employment, he cannot recover those damages to the extent they were proximately caused by his arrest and prosecution. He can only recover for those damages to the extent they were a reasonably foreseeable consequence of the use of excessive force." Here, there is a lack of evidence causally linking Sherman's reassignment to the use of excessive force. Rather he testified that it was because "if you have felony, you cannot be around kids." Tr. at 71.

The second *Gore* factor is the ratio of punitive to compensatory damages. Here that ratio is a 10:1. In this regard, the following excerpt from in *Payne* is instructive:

> When the compensable injury was small but the reprehensibility of the defendant's conduct was great, the ratio of a reasonable punitive award to the small compensatory award will necessarily be very high. *See, e.g., State Farm*, 538 U.S. at 425, 123 S. Ct. 1513 ("[R]atios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." (internal quotation marks omitted)); *Lee*, 101 F.3d at 811 ("[I]n a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated.... [T]he use of a multiplier to assess punitive damages is not the best tool...."). If in such cases significant punitive awards are not available, because of the high ratio in relation to the compensatory award, a plaintiff will often be unable to sue as attorneys would be unable to collect a reasonable fee through a contingency arrangement. Thus, in cases of very small injury but very reprehensible conduct, the appropriate ratios can be very high. In *Lee*, for instance, the plaintiff was awarded $1 in nominal damages and $200,000 in punitive damages on his malicious prosecution claim under 42 U.S.C. § 1983 against a police officer who attacked him and then falsely accused him of assault. *See Lee*, 101 F.3d at 807–08. On appeal, we reduced the punitive damages to $75,000. *See id.* at 813. Even after the remittitur, the ratio was huge at 75,000 to 1. But 75,000 to 1 was an appropriate ratio on those facts. In such cases, the large size of the ratio has no necessary bearing on the appropriateness of the amount of punitive damages. On the other hand, when the harm to the plaintiff is substantial, and sufficient to result in a compensatory award large enough to finance a reasonable contingent attorneys' fee, even a single digit ratio can mean a high punitive award approaching $1 million. Thus, the Supreme Court observed in *State Farm*, "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit. . . ." 538 U.S. at 425, 123 S.Ct. 1513.
>
> Here, the ratio of the $300,000 punitive damages award to Jones's $60,000 compensatory award is 5 to 1. The ratio, without regard to the amounts, tells us little of value in this case to help answer the question whether the punitive award was excessive. Had the facts of the harm to Payne been such that the jury appraised his compensable loss at

only $10,000 based on the same conduct by Jones, and the jury had
imposed a punitive award on Jones of $100,000, we would not consider
the punitive award excessive, even though the ratio of 10–to–1 would
have been twice as high as the 5–to–1 ratio that actually resulted. On
the other hand, if exactly the same conduct by Jones had caused Payne
$300,000 of compensable harm by reason of a concealed susceptibility
of which Jones was not aware, and the jury had imposed the same
$300,000 in punitive damages, the punitive damages would appear to
us to be very high (because of the relevant low degree of
reprehensibility of Jones's conduct) although representing only a 1–to–
1 ratio. The 5–to–1 ratio of punitive to compensatory damages, by
itself, tells nothing about whether the punitive award was excessive,
but given the substantial amount of the compensatory award, the
punitive award five times greater appears high.

711 F.3d at 102–03; *accord  State Farm Mutual Automobile Insurance Co. v.*

*Campbell*, 538 U.S. 408, 425 (2003) (stating that "in practice, few awards exceeding

a single-digit ratio between punitive and compensatory damages, to a significant

degree, will satisfy due process," but later stating in the same opinion that greater

ratios "may comport with due process where a particularly egregious act has

resulted in only a small amount of economic damages.");  *Lee v. Edwards*, 101 F.3d

805, 811 (2d Cir. 1996) (noting that a punitive damages award over 500 times

greater than a compensatory damages award could be reasonable where the

compensatory damages are nominal); *but cf. Turley,* 774 F.3d at 165 ("As a general

matter, the four-to-one ratio of punitive to compensatory damages awarded is close

to the line of constitutional impropriety. And where, as here, the compensatory

damages award is imprecise because of the nature of the injury and high when

compared with similar cases, lesser ratio, perhaps only equal to compensatory

damages, can reach the outermost limit of the due process guarantee.") (internal

quotation marks and citations omitted).

Viewed against the foregoing, and given the substantial compensatory damages awarded, the ratio of 10:1 appears high.

Turning to the third *Gore* factor, the decision in *Payne* is once again instructive.[2]

> Applying [the third] guidepost to this case, it appears that Jones's conduct could support his prosecution in New York for a class "A" misdemeanor of assault in the third degree. See N.Y. Penal Law § 120.00. An individual is guilty of assault in the third degree when, "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person." *Id*. Assault in the third degree is punishable by a prison sentence up to a maximum of one year, see id. § 70.15(1), and by a fine not to exceed $1,000, see id. § 80.05(1). However, the law does not mandate either a prison sentence or a fine. The fact that New York classes Jones's conduct as warranting criminal prosecution tends to confirm the appropriateness of the imposition of a punitive award. However, it tells little about the appropriateness of the amount of the award. At the same time, the fact that the offense is classed by New York as only a misdemeanor, and that courts are at liberty under New York law to impose no imprisonment or fine whatsoever on a violator (while New York law mandates minimum sentences for numerous offenses), tend to suggest that New York regards this conduct as occupying the lower echelons of criminality. As the law allows New York courts complete discretion as to the sentence to be imposed, the punishment that New York courts would impose on one found guilty of this misdemeanor would, of course, depend on a variety of factors, including importantly the degree of reprehensibility of the defendant's conduct. In cases where the degree of reprehensibility was most aggravated, a sentence of one year's imprisonment could be imposed, as well as a fine of up to $1,000. Without doubt a sentence of a year in jail is a substantial punishment. But when the degree of reprehensibility was low, the court might impose neither jail time nor fine. . . . The fact that New York does classify Jones's conduct as a class "A" misdemeanor . . . strongly

---

[2] The Second Circuit described the conduct at issue in *Payne* as follows: "Payne kicked Jones in the groin area. Jones reacted by punching Payne in the face and neck seven to ten times and kneeing him in the back several times. Payne, who was still handcuffed, defended himself by putting his hands up to cover his face and rolling on the bed to turn his back toward Jones. A nurse rushed forward and grabbed Jones, who then stopped punching Payne. The attack lasted 30 seconds or less." 711 F.3d at 88.

supports the imposition of some punitive award, but it tells very little
about whether the particular award was excessive.

*Payne*, 711 F.3d at 103–04 (footnotes omitted).

Having considered the *Gore* factors, the Court finds that a punitive damage
award of $200,000.00 is appropriate in this case. Although the conduct of
Defendants was reprehensible, there is no evidence that it was repetitive. Moreover,
it appears that the compensatory award was for pain and suffering and the amount
of that award is substantial. Finally, New York regards the conduct at issue as
being on the lower end of criminality.

The propriety of a $200,000 punitive damages award is confirmed when
compared to awards for similar conduct. For example, in *Payne,* another excessive
force case, the jury's punitive damages award of $300,000 was found excessive and
reduced to $100,000. 711 F.3d at 106. Similarly, in *DiSorbo v. Hoy*, 343 F.3d 172,
189 (2d Cir. 2003), the Second Circuit reduced a $1.275 million punitive damages
award to $75,000. In that case the defendant officer arrested the plaintiff after she
spurned his advances at a bar. Once at the police station, the defendant slammed
the plaintiff into the entry door and then pushed her against a wall, grabbing her
throat and choking her. He responded to her efforts to defend herself by throwing
her to the ground and striking her repeatedly.

In sum, the punitive damages award of $1,000,000.00 is excessive and remittitur is appropriate. Defendant is granted a new trial on punitive damages[3] unless Plaintiff accepts a reduced punitive damages award totaling $200,000.00.

## CONCLUSION

For the reasons set forth above, Defendants' motion pursuant to Fed. R. Civ. Pro. 50 and 59 is granted to the extent that Defendant is granted a new trial on punitive damages unless Plaintiff accepts a reduced punitive damages award totaling $200,000.00; it is otherwise denied. Plaintiff shall advise the Court on or before July 10, 2020 whether he accepts the remittitur.

**SO ORDERED.**

Dated: Central Islip, New York          s/ Denis R. Hurley
       June 10, 2020                    Denis R. Hurley
                                       United States District Judge

---

[3] *See Payne*, 711 F.3d at 106 (vacating punitive damages award and ordering a new trial limited to the issue of the amount of punitive damages unless plaintiff agreed to remittitur).